# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                                    No. CR 15-4078 JB

PETER PAGAN,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Objection to Presentence Report, filed November 2, 2016 (Doc. 49).  The Court held a hearing on November 8, 2016.  The primary issue is whether the Court should sustain Defendant Peter Pagan's objection to a 2-level enhancement under United States Sentencing Guideline ("U.S.S.G.") § 2B3.1(b)(4)(B) for "physical restraint" in his commission of his armed robbery against Lotaburger in Albuquerque, New Mexico.  Because Pagan did not (i) bind the victims; (ii) impede egress from the Lotaburger; (iii) tell the victims not to move; or (iv) impede drive-thru customer W.H. from leaving the parking lot, the Court concludes that the sentencing enhancement for physical restraint is inapplicable, and the Court therefore sustains Pagan's objection.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, filed October 13, 2016 (Doc. 45)("PSR").  Pagan was born in San Francisco, California, to Marcos Pagan-Cartiagano, age fifty, and to Roxanne Ruiz, age forty-five.  See PSR ¶ 52, at 15.  He resided in San Francisco until age seven, when his family relocated to Albuquerque, New Mexico, to be closer to relatives.  See PSR ¶ 52, at 15.  Pagan advises that he has lived in the Albuquerque area

ever since that move.  See PSR ¶ 52, at 15.  Pagan's parents are married, and he has a good relationship with them.  See PSR ¶ 53, at 15.  Pagan has five siblings, who are in good health and with whom Pagan spoke regularly before his incarceration.  See PSR ¶¶ 54-55, at 15.  Pagan reports that he had a good childhood and had all the basic necessities growing up.  See PSR ¶ 55, at 15.  He denies suffering any abuse as a youth, but he recalls seeing one of his older brothers rape his younger brother.  See PSR ¶¶ 55-56, at 15.

Pagan has been in an "on-off" relationship with Amanda Blea, age twenty-four, since he was approximately fifteen years old.  PSR ¶ 58, at 15.  Pagan and Blea have been residing together since approximately 2014, see PSR ¶ 58, at 16, and they have two children together, see PSR ¶ 59, at 16.  Blea and the two children are in good health.  See PSR ¶ 59, at 16.  Pagan has another daughter with Audry Chavez, and that daughter lives with Pagan's mother.  See PSR ¶ 60, at 16.  Pagan also has a daughter with Ashley Nicole Cordova, who resides with her mother in Albuquerque and whom Pagan has neither seen nor financially supported for approximately one and a half years.  See PSR ¶ 61, at 16.  Pagan denies any other children or marriages.  See PSR ¶ 61, at 16.

Pagan dropped out of high school during his eighth or ninth grade year and has not obtained his GED.  See PSR ¶ 80-81, at 18.  Evaluation reports reflect that Pagan falls in the borderline range for intellectual functioning at around the third percentile, and he was found incompetent three times in state proceedings as a juvenile.  See PSR ¶ 82, at 19.  Pagan has a learning disorder, see PSR ¶ 71, at 17, and psychological testing found him to have deficits in judgment, reasoning, impulse control, understanding of cause-and-effect, and an ability to plan ahead, see PSR ¶ 70, at 17.

Pagan was employed for six months at Sonic Drive-in Restaurant in Albuquerque before

2006.  See PSR ¶ 85, at 19.  He began receiving Social Security Disability (SSD) in the amount of $700.00 a month at age seventeen, but he did not reapply for SSD after turning eighteen.  See PSR ¶ 86, at 19.  The Torrance County Detention Center in Estancia, New Mexico, has employed Pagan as a Game Porter since August, 2016.[1]  See PSR ¶ 84, at 19.

Since coming of age, Pagan has been arrested and convicted four times, including this conviction.  See PSR ¶ 31-33, at 8-9.  First, on February 6, 2014, Pagan was arrested for receiving stolen property in relation to a stolen vehicle.  See PSR ¶ 31, at 8.  He was convicted and sentenced to 364 days custody with 239 days suspended.  See PSR ¶ 31, at 8.  Second, on July 15, 2015, Pagan was arrested for shoplifting beer from a convenience store.  See PSR ¶ 32, at 8.  He was convicted of shoplifting $250.00 or less and was sentenced to two days in jail with credit for time served and seventy-seven dollars in fees converted to jail.  See PSR ¶ 32, at 8.  Third, also on July 15, 2015, Pagan was arrested and charged with (i) assault with intent to commit a violent felony; (ii) attempt to commit armed robbery; (iii) six counts of assault with a deadly weapon; and (iv) shooting at a dwelling or occupied building.  See PSR ¶ 33, at 8-9.  He was convicted only of criminal damage to property over one thousand dollars, and he was sentenced to eighteen months of suspended custody, one year of parole, eighteen months of supervised probation, and $175 in fees.  See PSR ¶ 33, at 8.

As a minor, Pagan was arrested four times.  See PSR ¶¶ 38-41, at 9-11.  First, on February 1, 2006, Pagan was arrested and charged with four counts related to graffiti.  See PSR ¶ 38, at 9.  The prosecuting attorney dismissed the charges.  See PSR ¶ 38, at 9.  Second, on January 16, 2008, Pagan was arrested and charged with four counts -- aggravated assault, conspiracy to commit aggravated assault, shooting at a dwelling or occupied building, and

---

[1]In his capacity as a game warden, Pagan has been responsible for distributing games to fellow detainees.  See PSR ¶ 84, at 19.

unlawful possession of a handgun by a minor.  See PSR ¶ 39, at 10.  A psychiatric/diagnostic evaluation was done, and the prosecutor dismissed the charges.  See PSR ¶ 39, at 10.  Third, on January 8, 2010, Pagan was arrested and charged with seven counts -- (i) battery upon a peace officer (two counts); (ii) unlawful possession of a handgun by a minor; (iii) unlawful carrying of a deadly weapon; (iv) possession of alcoholic beverage by a minor; (v) possession of drug paraphernalia; and (vi) concealing identity.  See PSR ¶ 40, at 10.  The court found Pagan to be incompetent and dismissed all counts.  See PSR ¶ 40, at 10.  Fourth, on June 23, 2010, Pagan was arrested and charged with twelve counts -- (i) kidnapping (two counts); (ii) conspiracy to commit kidnapping; (iii) armed robbery; (iv) conspiracy to commit armed robbery; (v) aggravated battery with a deadly weapon (two counts); (vi) shooting at or from a motor vehicle, causing or risking great bodily harm;[2] and (vii) aggravated assault with a deadly weapon (four counts).  See PSR ¶ 41, at 11.  A psychiatric/diagnostic evaluation was performed, Pagan was found to be incompetent, and the prosecutor was unwilling to pursue the charges (nolle prosequi).  See PSR ¶ 41, at 11.

After reaching age eighteen, Pagan was arrested another nine times but was not charged as an adult.  See PSR ¶¶ 42-50, at 11-14.  First, on March 8, 2012, Pagan was arrested and charged with two counts -- battery and as an accessory -- in relation to an assault on another inmate at Bernalillo County Metropolitan Detention Center in Albuquerque, New Mexico.  See PSR ¶ 42, at 11.  The prosecutor was unwilling to pursue the charges (nolle prosequi).  See PSR ¶ 42, at 11.  Second, on May 9, 2013, Pagan was arrested for receiving or transferring a stolen motor vehicle.  See PSR ¶ 43, at 11-12.  The court dismissed the charge without prejudice.  See

---

[2]The PSR reports this charge as "Shooting At Or From A Motor Vehicle - Great Bodily Harm."  PSR ¶ 41, at 11.  It does not clarify whether Pagan inflicted or risked inflicting "great bodily harm."  PSR ¶ 41, at 11.  The probation office requested an incident report but did not receive one.  See PSR ¶ 41, at 11.

PSR ¶ 43, at 11.  Third, on December 3, 2013, Pagan was arrested and charged with two counts -- battery against a household member and criminal damage to property of a household member.  See PSR ¶ 44, at 12.  The case was dismissed without prejudice.  See PSR ¶ 44, at 12.  Fourth, on February 6, 2014, Pagan was arrested and charged with two counts -- receiving or transferring stolen motor vehicles and driving without a license.  See PSR ¶ 45, at 12.  The prosecutor was unwilling to pursue the charges, and the case was dismissed.  See PSR ¶ 45, at 12.  Fifth, on June 5, 2014, Pagan was arrested and charged with aggravated battery.  See PSR ¶ 46, at 13.  The court dismissed the case when a witness failed to appear.  See PSR ¶ 46, at 13.  Sixth, on August 8, 2014, Pagan was arrested and charged with shoplifting alcohol from a Wal-Mart.  See PSR ¶ 47, at 13.  The case was dismissed for lack of prosecution.  See PSR ¶ 47, at 13.  Seventh, on August 13, 2014, Pagan was arrested and charged with two counts -- robbery and conspiracy to commit robbery.  See PSR ¶ 48, at 13.  The case was dismissed without prejudice when the victim, a necessary witness, was uncooperative.  See PSR ¶ 48, at 13.  Eighth, on June 27, 2015, Pagan was arrested and charged with assault against a household member.  See PSR ¶ 49, at 14.  The case was dismissed when the prosecution was unable to proceed.  See PSR ¶ 49, at 14.  Ninth and last, on July 20, 2015, Pagan was arrested and charged with two counts -- larceny and receiving stolen property.  See PSR ¶ 50, at 14.  The case was dismissed without prejudice.  See PSR ¶ 50, at 14.

On January 27, 2015, Pagan attempted to rob Blake's Lotaburger, a fast food restaurant, in Albuquerque.  See PSR ¶ 10, at 4.  He grabbed a firearm from his sweatshirt and pointed it at two Lotaburger employees, demanding money from the cash register.  See PSR ¶ 10, at 4.  The employees were unable to open the cash register, and Pagan shot one round into the ceiling above their heads.  See PSR ¶ 10, at 4.  Pagan then demanded money again.  See PSR ¶ 10, at 4.

The Lotaburger manager opened the restaurant's back door and told a drive-thru customer to call law enforcement.  See PSR ¶ 10, at 4.  Pagan ran out of the restaurant, and the drive-thru customer followed him in an attempt to get Pagan's description.  See PSR ¶ 10, at 4.  Pagan then shot about nine rounds into the drive-thru customer's truck, hitting the front driver's door, the rear door, the driver's side bed of the truck, and a front tire.  See PSR ¶ 10, at 4.  The drive-thru customer was uninjured and returned to the restaurant in fear of being shot.  See PSR ¶ 10, at 4.

The provisions of the Mandatory Victim Restitution Act of 1996, 18 U.S.C. § 3663A, apply to this offense.  See PSR ¶ 14, at 4.  On October 3, 2016, the shift manager at Blake's Lotaburger at the time of Pagan's robbery reported that the restaurant had suffered a financial loss for the damage to the building and the loss of business resulting from early closure of the restaurant that day.  See PSR ¶ 15, at 4.  The shift manager expressed interest in providing a verbal victim impact statement, but has not has responded to a message from the United States Probation Office ("USPO"), see PSR ¶ 15, at 4-5, but Blake's Lotaburger's human resource department advised the USPO that restitution will be requested after it has determined the amount and obtained documentation, see PSR ¶ 16, at 5.  Neither of the employees manning the cash registers at the time of the robbery currently work at Blake's Lotaburger.  See PSR ¶ 15, at 5.  The USPO left messages with one of the former cashiers, but has not received a response.  See PSR ¶ 15, at 5.  The USPO made contact with the other former cashier, but that cashier declined to provide a statement.  See PSR ¶ 16, at 5.

## **PROCEDURAL BACKGROUND**

The two charges to which Pagan has pled guilty in this case are: (i) Interference with Commerce by Threats or Violence; and (ii) Using, Carrying, and Discharging a Firearm During and in Relation to a Crime of Violence, and Possessing and Discharging a Firearm in

Furtherance of Such Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  On November 17, 2015, the United States filed an Indictment in the United States District Court for the District of New Mexico charging Pagan with two counts.  See Indictment at 1-2, filed November 17, 2015 (Doc. 3).  The first count is Interference with Commerce by Threats or Violence.  See Indictment at 1-2.  The second count is Using, Carrying, and Discharging a Firearm During and in Relation to a Crime of Violence, and Possessing and Discharging a Firearm in Furtherance of Such Crime.  See Indictment at 2.  The Court will discuss the remainder of the procedural background in three sections.  First, it will describe Pagan's plea agreement.  Second, it will describe the PSR's sentencing guidelines calculations.  Third, it will discuss Pagan's objection to the PSR and the attendant hearing on the objection.

**1.      Pagan's Plea Agreement.**

On August 8, 2016, Pagan pled guilty to the two-count Indictment.  See Plea Agreement, filed August 8, 2016 (Doc. 42).  In the plea agreement, Pagan specifically admitted to the following facts related to the charges against him in this case:

> At about 8:30 p.m. on January 27, 2015, I entered a Blake's Lotaburger located at 6215 San Antonio Drive NE, Albuquerque, New Mexico.  The restaurant was not crowded but still open for business.  I entered the restaurant with a loaded 9mm handgun with the intention of robbing the restaurant.  When I entered, there was a Blake's employee mopping the floor and I passed him and headed toward the ordering station where cash registers are located.  There were Blake's employees by the cash registers and I showed my firearm as I demanded of the employees money from the cash drawers.  The employees began telling me that they couldn't open the cash drawers because they didn't have the key to [sic] them and to show them that I was serious about my demands for the money and that I meant business, I fired a round from my handgun into the ceiling of the restaurant just above the employees and the cash registers.  When it became clear that the employees, F.B., E.R., and A.L. could not open the cash drawers and give me the money, I pocketed my handgun in the pouch of my hooded sweatshirt and ran out of the Blake's Lotaburger.  In the course of my attempted robbery of the restaurant, I tried to further the attempt by threatened force, violence, and fear of injury by displaying and discharging my firearm and as a result of my attempted robbery, the Blake's Lotaburger closed for business earlier than usual which had a

negative impact on its ability to conduct business and the sale of food items which obstructed and affected its ability to conduct commerce.

Plea Agreement ¶8, at 4.  By signing the plea agreement, Pagan admitted that there was a factual basis for each element of the crimes to which he was pleading guilty.  See Plea Agreement ¶ 9, at 4.  Furthermore, Pagan agreed that the Court may rely on any of these facts, as well as facts in the PSR, to determine his sentence, including but not limited to the advisory guideline offense level.  See Plea Agreement ¶ 9, at 4-5.  In the plea agreement, Pagan stipulated a specific sentence of 27 months imprisonment as to Count 1 and 120 months imprisonment as to Count 2, for a total of 147 months imprisonment.  See Plea Agreement ¶ 10a, at 5.  The Plea Agreement took into account Pagan's acceptance of responsibility,[3] with no further reduction to occur.  See Plea Agreement ¶ 10a, at 5.  Pagan agreed to waive his right to appeal his conviction or sentence under 28 U.S.C. § 1291 or 18 U.S.C. § 3742, see Plea Agreement ¶ 15, at 8, and waived his right to collaterally attack his conviction or sentence under 28 U.S.C. §§ 2241 or 2255 except on the issue of defense counsel's ineffective assistance, see Plea Agreement ¶ 15, at 8.  Pagan recognized that the Plea Agreement already conferred a benefit upon him, and agreed not to seek a downward departure or variance from the specific sentence of 147 months.  See Plea

---

[3]Pagan provides the following statement accepting responsibility for the offense:

On January 27, 2015, I tried to rob the Lota Burger [sic] on San Antonio in Albuquerque.  I was scared and frustrated and fired a shot into the ceiling of the store.  I never did get any money and I just ran away.

I am very sorry to have done this.  I don't know what I was thinking.  I was just desperate and stupid.  I am sorry that I scared the guys who were working there and I am just glad nobody got hurt.

I know I have a drug problem.  I did really well when I was in treatment or under supervision and I would like to get more help to keep this sort of thing from happening again.

PSR ¶ 17, at 5.

Agreement ¶ 13, at 6.

       **2.**        **The PSR's Sentencing Guidelines Calculations.**

The PSR states that Pagan's base offense level for a violation of 18 U.S.C. § 1951(a) is 20.  See PSR ¶ 20, at 5.  The PSR adds 2 levels under U.S.S.G. 2B3.1(b)(4)(B), because the USPO states that Pagan "physically restrained the victim to facilitate commission of the offense or to facilitate escape . . . ."  PSR ¶ 21, at 5.  The PSR subtracts 2 levels under U.S.S.G. § 3E1.1(a) for Pagan's acceptance of responsibility.  See PSR ¶ 26, at 6.  The PSR subtracts 1 additional level for acceptance of responsibility under U.S.S.G. § 3E1.1(b), because Pagan assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a guilty plea.  See PSR ¶ 27, at 6.  The resulting total offense level in the PSR is 19.  See PSR ¶ 28, at 6.

Pagan's past convictions result in 3 criminal history points.  See PSR ¶¶ 34-35, at 9.  Two points derive from Pagan's receipt of stolen property in 2014 and one point from Pagan's shoplifting in 2015.  See PSR ¶¶ 31-32, at 8.  A criminal history score of 3 establishes a criminal history category of II.  See PSR ¶ 35, at 9.  The PSR states that, based on a total offense level of 19 and a criminal history category of II, the applicable guideline range for Count 1 is 33 months to 41 months imprisonment.  See PSR ¶ 92, at 20.  The PSR further states that, based on a total offense level of 19 and a criminal history category of II, the applicable guideline range for Count 2 is the statutory term of 10 years, which must run consecutively to Count 1, for a total guideline range of 153 to 161 months.  See PSR ¶ 92, at 20.

The PSR reports that, under 18 U.S.C. § 3583(b), the Court may impose a term of supervised release for not more than three years for Count 1 and for not more than five years for Count 2.  See PSR ¶ 95, at 20.  According to the USPO, multiple terms of supervised release

shall run concurrently.  See PSR ¶ 96, at 20.  Under U.S.S.G. § 5D1.2(a), the guideline range for supervised release for Count 1 is 1 year to 3 years and for Count 2 is 2 years to 5 years.  See PSR ¶ 97, at 20.  According to the PSR, Pagan is not eligible for probation on either Count.  See PSR ¶ 98, at 20-21 (citing 18 U.S.C. § 3561(a)(2)-(3)).  In light of the offense's nature and circumstances and Pagan's history and characteristics, the PSR says that the Court may consider imposing supervision conditions.  See PSR ¶ 101, at 21.[4]

The PSR reports that, under 18 U.S.C. § 3571(b), the maximum fine for Count 1 is $250,000.00, and the maximum fine for Count 2 is $250,000.00.  See PSR ¶ 102, at 21.  According to the PSR, a special assessment of $100.00 is mandatory for Count 1, and another special assessment of one hundred dollars is mandatory for Count 2.  See PSR ¶ 103, at 21.  The fine range under the sentencing guidelines is from $12,500.00 to $125,000.00.  See U.S.S.G. §§ 5E1.2(c)(3) and 5E1.2(h)(1).

According to the PSR, costs of prosecution shall be imposed on Pagan as statute requires.  See PSR ¶ 105, at 21.  The PSR says that, in determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment, and term of supervised release imposed.  See PSR ¶ 105, at 21 (citing U.S.S.G. § 5E1.2(d)(7) & 18 U.S.C. § 3572(a)(6)).  The PSR says that these costs may include drug and alcohol treatment, electronic monitoring, and/or confinement costs.  See PSR ¶ 105, at 21.  According to the PSR, restitution shall be ordered in this case under 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1.  See PSR ¶¶ 106-07, at 21-22.

The probation officer identified Pagan's mental and emotional condition as potential grounds for departure.  See PSR ¶ 110, at 22.  Pursuant to U.S.S.G. § 5H1.3, mental and

---

[4]The PSR sets forth these conditions in Attachment A to the PSR.  See Attachment A to the Presentence Report, filed October 13, 2016 (Doc. 45-1).

emotional conditions may be relevant in determining whether a departure is warranted, if the conditions -- individually or in combination with other offender characteristics -- are present to an unusual degree and distinguish the case from the typical cases that the sentencing guidelines cover.  See PSR ¶ 110, at 22.  During the presentence interview, Pagan reported a history of Post-Traumatic Stress Disorder ("PTSD"), Attention Deficit Hyperactive Disorder ("ADHD"), and Attention Deficit Disorder ("ADD").  PSR ¶ 111, at 22.  A forensic evaluation diagnosed Pagan with Oppositional Defiant Disorder; marijuana, alcohol, and inhalant abuse; a learning disability in reading and writing areas, while ruling out ADHD.  See PSR ¶ 111, at 22.  Earlier psychological testing in 2010 reflected that Pagan was in the borderline range for intellectual function, and had deficits in judgment, reasoning, impulse control, ability to plan ahead, and understanding of cause and effect.  See PSR ¶ 111, at 22.  A more recent psychological evaluation, in 2016, determined that Pagan has a poor self-image, and that he likely suffers from guilt, despair, anxiety, and depression, all of which have led to suicide attempts.  See PSR ¶ 112, at 22.[5]  Because Pagan has been in custody in relation to the Blake's Lotaburger robbery, he has further been diagnosed with opioid dependence, but the diagnosis ruled out Pagan's self-reported PTSD.  See PSR ¶ 112, at 22.  Juvenile history records indicate that multiple cases were dismissed after Pagan was found incompetent.  See PSR ¶ 112, at 22.

The PSR concludes, however, that a downward departure based on mental and emotional condition is not warranted.  See PSR ¶ 113, at 22-23.  The PSR states that Pagan will be able to receive mental health treatment while in the Bureau of Prisons' custody and while on supervised release.  See PSR ¶ 113, at 23.  Furthermore, the PSR says that Pagan agreed not to seek a downward departure from the agreed sentence.  See PSR ¶ 113, at 22-23.  The PSR notes that

---

[5]The PSR caveats that Pagan's suicide attempts may be a means of seeking attention rather than a true attempt at death.  See PSR ¶112, at 22.

Pagan was helping to care for his two children with Blea before his arrest and that this parental responsibility may warrant a sentence outside of the advisory guideline system.  See PSR ¶ 114, at 23-24.

### 3.    Pagan's Objection to the Presentence Report.

On November 2, 2016, Pagan filed a Defendant's Objection to Presentence Report.  See Defendant's Objection to Presentence Report, filed November 2, 2016 (Doc. 49)("Objection"). Pagan objects to PSR ¶ 21, which assesses 2 offense levels for "restraint of victim" under U.S.S.G. § 2B3.1(b)(4)(B).  See Objection at 1.  Pagan argues that Application Note 4 to U.S.S.G. § 2K2.4 states that the Court should "not apply any specific offense characteristic" involving a weapon if the case also includes a conviction under 18 U.S.C. § 924(c).  Objection at 1 (quoting Application Note 4 to U.S.S.G. § 2K2.4).  Pagan asserts that, in light of the fact that this case involves a ten-year mandatory minimum under 18 U.S.C. § 924(c) for discharge of a firearm, the 2-level enhancement for restraint of a victim constitutes impermissible double counting and should be struck from the PSR.  See Objection at 1.  According to Pagan, the factual basis for the restraint of victim enhancement is the use of the same firearm that is the basis of the 924(c) count and, as such, is inappropriate.  See Objection at 1-2.

Pagan argues that "physically restrained" has a specific meaning under the sentencing guidelines, which define it as "the forcible restraint of the victim such as by being tied, bound, or locked up."  Objection at 2.  Pagan asserts that nothing like that happened when he robbed the Blake's Lotaburger.  See Objection at 2.  According to Pagan, a specific offense characteristic's purpose is to distinguish between cases based on conduct.  See Objection at 2.  As a practical matter, Pagan argues, cases such as United States v. Miera, 539 F.3d 1232 (10th Cir. 2008), have expanded the definition of restraint of the victim so broadly that the expansion amount to judicial

amendment of the sentencing guidelines to change the base offense level for robbery from 20 to 22.  See Objection at 2.  Pagan compares the base offense levels for larceny or theft -- 6 or 7 -- with the base offense level for robbery -- 20, and argues that the level is so much higher for robbery, because robbery necessarily involves some amount of threat or violence.  See Objection at 2.  Pagan insists that enhancing the base offense level is inappropriate merely when the victim of a robbery feels that the very show of force that makes the offense a robbery "restrains" him or her.  Objection at 2.  Pagan urges the Court to honor the specific definition of restraint of the victim in the sentencing guidelines and to decline to apply the 2-level enhancement in this case.

On a final note, Pagan argues that United States v. Miera requires "something more" than discharging, brandishing, or displaying a firearm for the restraint of the victim enhancement to apply.  Objection at 3 (quoting 539 F.3d at 1234).  Pagan says that, in United State v. Miera, the defendants instructed the victims to put their hands up and not to move.  See Objection at 3.  Pagan reemphasizes that he did not issue any direct order to the victims in this case except for his order for them to hand over the money.  See Objection at 3.  Moreover, according to Pagan, he did not tie, bind, or lock up the victims.  See Objection at 3.  Pagan asserts, therefore, that the case's facts do not support an enhancement for restraint of the victim.

## RELEVANT LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether

a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to considerable deference. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period

- 14 -

of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593

(10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They

are significant, because "the Guidelines are an expression of popular political will about

sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years'

worth of careful consideration of the proper sentence for federal offenses."  United States v.

Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also

"avoid[s] unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543

U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within

the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d

1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption, and not

one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v.

United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91

(2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any

presumption in favor of the advisory[6] Guidelines sentence.  See Rita v. United States, 551 U.S. at

---

[6]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more
appropriate to say that the resulting Guideline ranges are advisory.  Gall v. United States, 522
U.S. at 46  ("As a result of our decision [in United States v. Booker], the Guidelines are now
advisory  [.]");  United States v. Leroy, 298 F. App'x 711, 712 (10th Cir.
2008)(unpublished)("[T]he Guidelines are advisory, not mandatory.");  United States v. Sells,
541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court
was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a)
factors, and an understanding that the Guidelines are advisory.").  The Court must consider the
Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must
give serious consideration to the extent of any departure from the Guidelines . . . ."), and must
accurately calculate the Guidelines range, see Gall v. United States, 522 U.S. at 49 ("[A] district
court should begin all sentencing proceedings by correctly calculating the applicable Guidelines
range.").  The Court is not mandated, however, to apply a sentence within the calculated

351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

**LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES**

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted). In United States v. Booker, the Supreme Court held

---

Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

    The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)).   The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the

broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence out to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[7]  "[T]he application of an enhancement . . . does not

_____

[7]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's

implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may only assert an error under Apprendi v. New Jersey where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[8](holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and

---

sentence from twenty years to consecutive forty-year terms).

[8]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Hendrickson; United States v. Powers, 578 F. App'x 763 (10th Cir. 2014)(unpublished); United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009)(unpublished); United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished); United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished); United States v. Duncan, 99 F. App'x 196 (10th Cir. 2004)(unpublished); United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762 (10th Cir. Jan. 12, 1999)(table opinion)(unpublished); and United State v. Webster, No. 94-3186, 68 F.3d 484 (10th Cir. Oct. 20, 1995)(table opinion)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

need only be proved to the sentencing judge by a preponderance of the evidence"). As the Court

has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u>, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from <u>Apprendi v. New Jersey</u>, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26[ (D.N.M. Aug. 29, 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M.

Nov. 3, 2014)(Browning, J.).

## ANALYSIS

The Court sustains Pagan's objection to the 2-level enhancement for physical restraint.

The Court concludes that physical restraint is not an intrinsic element of armed robbery and,

therefore, is not incorporated into the base offense level for armed robbery under the sentencing

guidelines. Accordingly, the physical restraint enhancement does not constitute impermissible

double counting. Nevertheless, Pagan did not physically restrain anyone during his commission

of the armed robbery, so the physical restraint enhancement does not apply to this case.

## I.   PHYSICAL RESTRAINT IS NOT INCORPORATED INTO THE ACT OF ARMED ROBBERY, SO THE PHYSICAL RESTRAINT ENHANCEMENT IS NOT DOUBLE COUNTING.

Although not every double counting is improper,[9] the Tenth Circuit repeatedly has held

that enhancements constitute improper double counting if they replicate an intrinsic element of

---

[9]"Most circuits have held that double counting is permissible where each of the multiple guidelines sections applicable to a single act serves a distinct purpose or represents a discrete harm, or where the guideline specifically contemplates this, or where the enhancements reflect 'conceptually separate' notions relating to sentencing." Author's Discussion § 6 to U.S.S.G. § 1.B1.1 (internal citations removed).

the offense being punished.  See, e.g., United States v. Wolfe, 435 F.3d 1289, 1292 (10th Cir. 2006); United States v. Reyes Pena, 216 F.3d 1204, 1209 (10th Cir. 2000).  Pagan asserts that the 2-level enhancement for physical restraint constitutes improper double counting in this case, arguing that physical restraint is an intrinsic element of armed robbery.  See Objection at 1-2.

The Tenth Circuit disagrees.  In a 1997 case, the Tenth Circuit considered a bank robbery in which one of the robbers held a gun to the security guard's head.  See United States v. Fisher, 132 F.3d 1327, 1328 (10th Cir. 1997)("Fisher").  In an opinion that then-Chief Judge Seymour wrote and Judges Porfilio and Murphy joined, the Tenth Circuit concluded that the robbery did not intrinsically require the physical restraint of a gun to the guard's head.  See 132 F.3d at 1329. More recently, the Tenth Circuit again considered a bank robbery, this time one in which an accomplice blocked the bank door and ordered the bank occupants not to move.  See United States v. Miera, 539 F.3d at 1233.  In an opinion that Judge Ebel wrote and that Judges Kelly and O'Brien joined, the Tenth Circuit concluded that blocking the door -- which the Tenth Circuit concluded was a physical restraint -- was not an intrinsic part of the robbery.  See 539 F.3d at 1234-36.

This Court also addressed whether physical restraint is an intrinsic element of armed robbery just a few months ago.  See United States v. Duran, 2016 WL 5395276 (D.N.M. Aug. 8, 2016)(Browning, J.).  In that case, the defendants robbed a Walgreens of oxycodone at gunpoint. See 2016 WL 5395276, at *1.  One defendant jumped over the counter and held a gun to the pharmacist, demanding that she give him all the oxycodone pills.  See 2016 WL 5395276, at *1. The USPO added a 2-level enhancement for physical restraint, but Duran -- like Pagan in this case -- objected that U.S.S.G. § 3A1.3 foreclosed the enhancement, because he asserted that "physical restraint" is intrinsic to armed robbery.   2016 WL 5395276, at *1.   The Court

disagreed and overruled Duran's objection, concluding that U.S.S.G. § 2D1.1 did not specifically incorporate the element of physical restraint and the enhancement therefore is not double counting.  See 2016 WL 5395276, at *7.

The Court sees no reason to diverge from Court of Appeals precedent or from the position it established a few months ago.  Physical restraint is not an intrinsic element of armed robbery and, therefore, is not incorporated into the guideline's base offense level.  Accordingly, the 2-level enhancement for physical restraint does not constitute double counting in armed robbery cases.

## II.     PAGAN DID NOT PHYSICALLY RESTRAIN THE VICTIMS.

A logical corollary to the above conclusion is that some armed robberies do not involve physical restraint.  To determine whether physical restraint was present during the robbery, a court must turn to U.S.S.G. § 1.B1.1.  That section defines physical restraint, for the purposes of the 2-level enhancement, as "the forcible restraint of the victim such as by being tied, bound, or locked up."  See Application Note 1(K) to U.S.S.G. § 1B1.1 (Application Instructions).

When it considered Fisher in 1997, the Tenth Circuit read the phrase "being tied, bound, or locked up" as an indication that keeping someone from doing something is inherent within the concept of restraint.  132 F.3d at 1329.  Three years later, another bank robbery case allowed the Tenth Circuit to clarify this stance.  See United States v. Pearson, 211 F.3d 524, 527 (10th Cir. 2000).  In that case, a robber held a gun on two bank employees to keep them from moving while his accomplice took a third employee to the bank vault.  See 211 F.3d at 527.  In an opinion that Judge Brorby wrote, and that Judges Kelly and Murphy joined, the Tenth Circuit held that an instruction not to move was an example of an act that kept others from doing something and, therefore, was by definition an example of physical restraint.  See 211 F.3d at 527.  The Tenth

Circuit contrasted this verbal order with the mere act of brandishing a gun, which in isolation does not keep anyone from doing anything:

> [W]e agree with the Ninth Circuit, and conclude that physical restraint with a gun is conduct distinct from either the actual discharge, "otherwise use," or brandishing, display or possession of a gun, as contemplated by § 2B3.1(b)(2)(A)-(F), and § 2K2.4, comment. (n.2).  In other words, those acts alone do not automatically create a situation where physical restraint of an individual occurs.  Instead, something more must be done with the gun to physically restrain them.

United States v. Pearson, 211 F.3d at 527.  The Tenth Circuit confirmed this distinction eight years later when it considered Miera, holding that blocking a bank door to prevent egress -- but not brandishing a gun by itself -- was an example of physical restraint.  See 539 F.3d at 1235-36.

In this case, Pagan brandished a gun, discharged rounds into the restaurant ceiling, and riddled drive-thru customer W.H.'s car with bullets.  See PSR ¶ 10, at 4.  Pagan did not, however, tie, bind, or lock up anyone.  Nor did he physically restrain anyone even under the Tenth Circuit's expansive interpretation of the term.  Pagan did not instruct the Blake's Lotaburger employees not to move, nor did he keep anyone from leaving the premises.  Indeed, the manager exited the restaurant through the back door, and drive-thru customer W.H. followed Pagan when Pagan left the premises -- Pagan did not follow W.H.  See PSR ¶ 10, at 4.

**IT IS ORDERED** that Peter Pagan's Objection to Presentence Report, filed November 2, 2016 (Doc. 49), is sustained.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Paul H. Spiers
Rumaldo R. Armijo
  Assistant United States Attorneys
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Albuquerque, New Mexico

*Attorney for the Defendant*